IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN HOME ASSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| AGM MARINE CONTRACTORS, INC., | ) ) ) |
| Defendant. | ) ) ) |

CIVIL ACTION NO. 04-11382-EFH

**AGM MARINE CONTRACTORS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON COVERAGE ISSUES**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................. ii-iv

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................... 2

ARGUMENT .................................................................................................. 6

I.      STANDARD FOR SUMMARY JUDGMENT ................................... 6

II.     THE POLICY PROVIDES COVERAGE FOR DAMAGES TO THE
        DOCKS AND PROJECT AND AGM'S MITIGATION COSTS. ......... 8

        A.    As A Matter Of Law, An Occurrence Happened Which Is Explicitly
              Covered By The Policy ......................................................... 9

        B.    As A Matter Of Law, AGM Suffered "Property Damage" ........... 11

              1.    AGM is entitled to recover its mitigation costs under the Policy ....... 13

        C.    AGM Is Entitled To Coverage Because the Work Was Performed By A
              Subcontractor ..................................................................... 14

        D.    AGM Is Entitled to Coverage Under the Products-Completed
              Operations Hazard Coverage ................................................ 17

CONCLUSION ............................................................................................. 21

# TABLE OF AUTHORITIES

## FEDERAL CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .......................... ......................... 7

American States Ins. Co. v. Powers, 262 F.Supp.2d 1245 (D. Kan. 2003) ..................... 18

ANR Prod. Co. v. Westburne Drilling, Inc., 581 F.Supp. 542 (D. Colo. 1984).............. 7

Bankers Trust Co. v. Hartford Accident and Indemnity Company, 518 F.Supp. 371,
373 (S.D.N.Y. 1981) ...................................................................................................... 13-14

Brosnaham Builders, Inc. v. Harleysville Mutual Ins. Co., 137 F.Supp.2d 517, 528
(D. Del. 2001) ................................................................................................................ 16, 18

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)................................................................ 6-7

Compagnie des Bauxites de Guinee v. Insurance Co. of North Am., 724 F.2d 369 (3rd
Cir. 1983)......................................................................................................................... 9-10

Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co., 169 F.3d 43 (1st Cir. 1999).... 17

Fidelity & Deposit Co. of Maryland v. Hartford Casualty Ins. Co., 189 F.Supp.2d
1212 (D. Kan 2002) ....................................................................................................... 10

First Fed. Sav. & Loan Ass'n of Gadsden County v. Peterson, 521 F.Supp. 416 (N.D.
Fla. 1981), rev'd on other grounds, 707 F.2d 1217 (11th Cir. 1983) ................................ 7

GRE Ins. Group v. Metro. Boston Hous. P'ship, Inc., 61 F.3d 79, 81 (1st Cir. 1995) .... 17

Green Constr. Co. v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania, 771
F.Supp 1000, 1003 (W.D. Mo. 1991) ............................................................................ 11, 17

Honeycomb Systems, Inc. v. Admiral Ins. Co., 567 F.Supp. 1400 (D. Me. 1983) ......... 11

Illinois Constructors Corp. v. Morency & Assoc., Inc., 802 F.Supp. 185, 188 (N.D.
Ill. 1992) ....................................................................................................................... 8

Imperial Casualty & Indemnity Co. v. High Concrete Structures, Inc.,858 F.2d 128
(3rd Cir. 1988) .............................................................................................................. 12

In re Litigation Involving Alleged Loss of Cargo from Tug Atlantic Seahorse, Sea
Barge 101 Between Puerto Rico and Florida in Dec. 1988, 772 F.Supp. 707, 711 (D.
Puerto Rico 1991) .......................................................................................................... 8

Intel Corporation v. Hartford Accident and Indemnity Company, 692 F.Supp. 1171,
1192 (N.D. CA. 1988) ...................................................................................................... 13

John Beaudette, Inc. v. Sentry Ins., 94 F.Supp.2d 77 (D. Mass. 1999).............................. 9, 17, 19

Limbach Co., LLC v. Zurich American Ins. Co., 396 F.3d 358 (4th Cir. 2005) .............. 15, 16

Masdea v. Scholz, 742 F.Supp. 713 (D. Mass. 1990) ........................................................ 7

McQuade v. Nationwide Mut. Fire Ins. Co., 587 F.Supp. 67 (D. Mass. 1984)................ 8

Mt. Airy Ins. Co. v. Greenbaum, 127 F.3d 15, 18 (1st Cir. 1997) ..................................... 20

National Union Fire Ins. Co. v. Structural Systems Technology, Inc., 964 F.2d 759
(8th Cir. 1992) .................................................................................................................. 15, 16

Potterton v. Porter, 810 F.2d 333 (1st Cir. 1987)............................................................... 7

Standard Structural Steel Co. v. Bethlehem Steel Corp., 597 F.Supp. 164 (D.C.
Conn. 1984)...................................................................................................................... 10

State Trading Corp. v. Assuranceforeningen Skuld, 921 F.2d 409 (2nd Cir. 1990) ...... 8

Szafarowicz v. Gotterup, 68 F.Supp.2d 38, 43 (D. Mass. 1999)...................................... 8

Travelers Ins. Companies v. Penda Corp., 974 F.2d 823 (7th Cir. 1992) ........................ 12

Trinity Universal Ins. Co. v. Broussard, 932 F.Supp 1307, 1310 (N.D. Okla. 1996) ..... 18-19

## STATE CASES

Aetna Casualty and Surety Co. v. M&S Indus., Inc., 827 P.2d 321 (Wa. Ct. App.
1992) ................................................................................................................................. 12

August A. Busch & Co. v. Liberty Mut. Ins. Co., 339 Mass. 239 (1959)......................... 9, 19

Camp Dresser & McKee, Inc. v. Home Insurance Co., 30 Mass. App. Ct. 318, 323
(1991) ............................................................................................................................... 17

Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142 (1982)...................................... 8

Continental Casualty Co. v. Gilbane Bldg. Co., 391 Mass. 143, 146-147 (1984) .......... 9

CU Lloyd's of Texas v. Main Street Homes, 79 S.W.3d 687 (Tex. Ct. App. 2002) ...... 16

Gaylord Chemical Corp. v. ProPump, Inc., 753 So.2d 349 (La. Ct. App. 1st Cir. 2000) ............................................................................................................................ 19, 20

Hakim v. Massachusetts' Insurers' Insolvency Fund, 424 Mass. 275 (1997) ............... 20

Kammeyer v. Concordia Tel. Co., 446 S.W.2d 486 (Mo. App. 1969) ........................... 20

Kidd v. Logan M. Killen, Inc., 640 So.2d 616 (La. Ct. App. 1st Cir. 1994) ................... 19

Koshland v. Columbia Ins. Co., 237 Mass. 467 (1921) .................................................. 8

Liberty Mut. Ins. Co. v. SCA Servs., Inc., 412 Mass. 330, 335 n.4 (1992) .................... 9

L-J, Inc. v. Bituminous Fire and Marine Ins. Co., 567 S.E.2d 489 (S.C. App. 2002) ..... 10, 16

Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462 (1995) .............. 8

MacArthur v. Mass. Hosp. Serv., Inc., 343 Mass. 670 (1962)........................................ 8

Marathon Plastics, Inc. v. International Ins. Co., 514 N.E.2d 479 (Ill. App. 1987) ........ 12

Mike Hooks, Inc. v. Jaco Services, Inc., 674 So.2d 1125 (La. Ct. App. 3rd Cir. 1996) .. 20

Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81 (1984) ...................................... 9

Peerless Inc. Co. v. Clough, 193 A.2d 444 (NH 1963) ................................................... 20

Rando v. Top Notch Properties, L.L.C., 879 So.2d 821 (La. Ct. App. 4th Cir. 2004) ..... 19, 20

Sterilite Corp. v. Continental Casualty Co., 17 Mass. App. Ct. 316, 318 (1983) ........... 9

Terrio v. McDonough, 16 Mass. App. Ct. 163, 167 (1983) ............................................. 9

Wanzek Constr., Inc. v. Employers Ins., 679 N.W.2d 322, 329 (Minn. 2004) ............... 15

## TREATISES

6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 56.20 (2d ed. 1988)........ 7

C. WRIGHT, A. MILLER AND M. KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2737 (1983 and Supp. 1988).................................................................................. 7

## PRELIMINARY STATEMENT

Defendant AGM Marine Contractors, Inc. ("AGM") submits this Memorandum of Law in support of its Motion for Partial Summary Judgment on Coverage Issues. In further support of this motion, AGM also submits the Affidavit of John Mikutowicz (the "Mikutowicz Aff.").

This motion presents coverage questions under a Commercial Marine Liability insurance policy. Specifically, AGM moves for partial summary judgment on the issue of whether the terms of an insurance policy issued by the Plaintiff, American Home Assurance Company ("American") cover: (i) physical damage to and loss of use of certain concrete floating docks resulting from a storm; (ii) the costs incurred by AGM to prevent further insurable losses; and (iii) alleged noncompliance with contract specifications and warranties by the docks' manufacturer. The docks were installed by AGM and its subcontractors in the Town of Provincetown, Massachusetts and were damaged in a storm on December 6-7, 2003.

The insurance policy is broadly written and explicitly provides coverage for products-completed operations hazards, an additional add-on coverage to the standard policy. The Plaintiff has failed and refused, however, to pay a single dollar for any of the losses suffered and/or costs incurred by AGM, contending that AGM's damages are excluded from the policy, notwithstanding, *inter alia*, the completed operations coverage purchased by AGM. The Defendants' position lacks merit. As is reflected in the clear and unambiguous language of the policy, AGM is entitled, as a matter of law, to recover damages suffered to its completed work that was performed by subcontractors, as explicitly provided for in the policy. Furthermore, AGM is independently entitled to recover damages suffered under the products-completed operations hazard coverage. Accordingly, AGM is entitled to partial summary judgment on these coverage issues. Addressing a significant portion of the coverage issues at this stage of the

1

litigation is an efficient use of the Court's and the parties' resources and will streamline the resolution of the remaining controversies.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, the following is a statement of the material facts as to which there is no genuine issue to be tried:

### The Project

The Town of Provincetown (the "Town") contracted with AGM for the reconstruction of MacMillan Pier (the "Project") which required, in part, the installation of a concrete floating dock system (the "Docks"). See Mikutowicz Aff. at ¶ 3.   The Docks were manufactured by a subcontractor, Southeast Floating Docks, Inc. ("Southeast"), to meet the plans and specifications issued by the Town. See Mikutowicz Aff. at ¶ 4. Installation of the Docks by AGM was completed in June 2003. See Mikutowicz Aff. at ¶ 5.   AGM also constructed a concrete pier, installed pilings and performed dredging work as part of the Project. See Mikutowicz Aff. at ¶ 6. The construction and installation of the Docks were only a portion of the overall Project, albeit, important to the functioning of the marina. See Mikutowicz Aff. at ¶ 7.

Over the weekend of December 5th through December 7th, 2003, the Docks were severely damaged during a winter storm (the "Storm") which produced winds in excess of 50 mph together with waves of approximately two feet in height. See Mikutowicz Aff. at ¶ 8.   The damages were most pronounced in what is known as the finger sections of the Docks, which protrude out from the main walkway, which Docks broke loose and suffered failure at the hinges. See Mikutowicz Aff. at ¶ 9.   AGM was subsequently directed by the Town, on December 8, 2003, to immediately dispatch emergency crews and equipment and capture the Docks that had broken free during the Storm and posed nautical hazards to the boats in the marina or otherwise

constituted a hazard in navigable waterways. See Mikutowicz Aff. at ¶ 10. AGM was also directed by the Town to salvage and secure whatever portions of the Docks remained in place. See Mikutowicz Aff. at ¶ 11. AGM subsequently brought a crane to the site and began to remove the sections of the Docks which had failed and ultimately was required by the Town to transport same for storage. See Mikutowicz Aff. at ¶ 12.  AGM kept track of its "Time and Materials" costs for performing the emergency response and salvage work, as well as the cost of transporting the materials to the Town's storage facility, which such costs and expenses totaled in excess of $250,000. See Mikutowicz Aff. at ¶ 13.

The Town alleges that Southeast failed to manufacture the Docks in accordance with the design parameters, breaching its warranties and leading to the failure during the Storm and the damages resulting therefrom. See Mikutowicz Aff. at ¶ 14.  The damage to the Docks has hindered the Town's ability to operate the marina and secure income from its operation. See Mikutowicz Aff. at ¶ 15.  At the request of the Town, to mitigate damages suffered and loss of use of the marina, AGM was required to install temporary docking facilities. See Mikutowicz Aff. at ¶ 16.

The Town alleges that AGM and its subcontractors failed to manufacture the Docks in accordance with the design specifications, and such failure caused the Docks to suffer damage as a result of the Storm. See Mikutowicz Aff. at ¶ 17.  The Town seeks from AGM indemnification as well as repair and/or replacement of the Docks. See Mikutowicz Aff. at ¶ 18. AGM denies that it deviated from the contract specifications or the direction of the Town's engineers or that it has breached any such warranties flowing to the Town in connection with AGM's completed work. See Mikutowicz Aff. at ¶ 19.

**The Policy**

The Plaintiff insurer issued a Commercial Marine Liability insurance policy (the

"Policy") for the Project, covering the period from January 1, 2003 through January 1, 2004. A

true, complete and accurate copy of the Policy is attached as Exhibit 1 to the Mikutowicz Aff.

The Policy's grant of coverage is broad, covering "those sums the Assured becomes legally

obligated to pay as damages because of… 'property damage' to which the insurance applies."

Mikutowicz Aff., Ex. 1 at p. 7. The Policy applies to that property damage that is caused by an

"occurrence" that happens within the Policy period. See Id. Moreover, "property damage" as

defined in Section 8 of the Coverage Form, Definitions provides that it shall mean:

    a.    Physical damage to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.    Loss of use of property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Mikutowicz Aff., Ex. 1 at p. 28. It is undisputed that the Docks suffered physical damage during

the Storm, requiring repair or replacement as demanded by the Town, and that such damage has

resulted in losses to the Town. Moreover, it is undisputed that AGM was required to expend

labor and materials to take emergency action to remove the damaged Docks from navigable

waters, as they posed a hazard to vessels and property in the marina and could have caused

further loss and damage for which American would be liable. AGM was subsequently required

to secure, remove and store the damaged Docks and install a temporary docking system for the

Town, thereby avoiding further claims against the Policy.

As the general contractor for the Project, AGM provided labor, materials and services

(including labor, services and materials provided by independent subcontractors) which are

included under and defined in Section 8 of the Coverage Form, Definitions as follows:

"The Assured's work" means:

a.    Work or operations performed by the Assured or on the Assured's behalf;

b.    Materials, pads or equipment furnished in connection with such work or operations.

"The Assured's work" includes:

a.    warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "the Assured's work"; and

b.    The providing of or failure to provide warnings or instructions.

Thus, the Policy provides that AGM and its subcontractors' work, and any warranties associated

therewith constitute the "Assured's work" as defined by the Policy.

The Policy also contains an extension of coverage, an add-on to the Policy purchased by

AGM, which is relevant to this motion. Coverage under the policy is explicitly extended to

insure "Products Hazard or Completed Operations Hazard or with respect to liability arising out

of independent contractors" in an aggregate limit of One Million Dollars ($1,000,000.00).

Section 8 of the Coverage Form, Definitions provides, in pertinent part, that:

(17)    "Products-completed operations hazard":

a.    Includes all… "property damage" occurring away from premises the Assured owns or rents and arising out of "the Assured's work"…

AGM neither owned, nor rented the marina or any property constituting the Project. See

Mikutowicz Aff. at ¶ 22.

The Policy contains several exclusions, two of which are asserted by American as

defenses with respect these claims. Specifically, within Section 1 of the Coverage Form, the

"Damage to Property" exclusion, section (2)(i) provides, in pertinent part, that the insurance does

not apply to:

"Property damage" to: … (6) That particular part of any property that must be restored repaired or replaced because "the Assured's work" was incorrectly performed on it.

However, this exclusion, paragraph 6, explicitly "does not apply to 'property damage'

included in the 'products-completed operations hazard.'

Furthermore, the "Damage to the Assured's Work" exclusion, section 2(k) states that the insurance does not apply to:

> "Property Damage" to: "the Assured's Work" arising out of it or any part of it and included in the "products-completed operations hazard". This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on the Assured's behalf by a subcontractor.

Thus, by its clear and explicit terms, and notwithstanding American's arguments to the contrary, the Policy provides coverage for damages to the Assured's Work if such damages are included in the "products-completed operations hazard" or if the Assured's work was performed on the Assured's behalf by a subcontractor.

**American's Denial of Claim**

In its response to AGM's notice of claim, American asserted that the Policy does not act as a warranty of AGM's work and that AGM solely carries the risk and costs of replacing and repairing defective work. American denies the existence of an "occurrence" resulting in "property damage." A true, complete and accurate copy of the denial letter is attached as Exhibit 2 to the Mikutowicz Aff. American fails in its denial to discuss application of the products-completed operations hazard coverage or the subcontractor exception to exclusion 2(k). As will be shown below, a straight forward reading of the Policy and the pertinent exclusions cited by the Insurer compels a finding that AGM is entitled to coverage for damages suffered as a result of the Storm.

**ARGUMENT**

**I.    STANDARD FOR SUMMARY JUDGMENT.**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v.

Catrett, 477 U.S. 317 (1986); Potterton v. Porter, 810 F.2d 333 (1st Cir. 1987). The party moving

for summary judgment meets its burden by establishing an absence of evidence to support the

opposing party's allegations. Celotex Corp., 477 U.S. at 325. The burden then shifts to the non-

moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R.

Civ. P. 56(e). Merely presenting "a scintilla of evidence in support of [the non-moving party's]

position will be insufficient; there must be evidence on which the jury could reasonably find for

the [non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Masdea v.

Scholz, 742 F. Supp. 713, 715 (D. Mass. 1990).

Partial summary judgment is also permitted under Federal Rule of Civil Procedure 56.

First Fed. Sav. & Loan Ass'n of Gadsden County v. Peterson, 521 F. Supp. 416, 417 (N.D. Fla.

1981), rev'd on other grounds, 707 F.2d 1217 (11th Cir. 1983); ANR Prod. Co. v. Westburne

Drilling, Inc., 581 F. Supp. 542 (D. Colo. 1984) (issues of contract interpretation decided on

motion for partial summary judgment while factual issues of product quality and negligence were

reserved for trial); see also 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 56.20 (2d

ed. 1988) ("It is clear that Rule 56 authorizes a summary adjudication that will often fall far short

of a final adjudication, even of a single claim..."); C. WRIGHT, A. MILLER AND M. KANE, FEDERAL

PRACTICE AND PROCEDURE: CIVIL 2D § 2737 (1983 and Supp. 1988). This case involves issues of

coverage, and damages. Partial summary judgment with respect to the specified coverage issues at

this stage of the litigation is an efficient use of the Court's and the parties' resources and will

streamline the resolution of the remaining controversies.

The undisputed facts show that the Storm was an occurrence under the Policy, resulting in

property damage which is covered by both the broad language of the Policy and the products-

completed operations hazard extension of coverage. Accordingly, AGM is entitled, as a matter of

law, to a declaration that it is covered under the Policy for the costs it incurred as a result of the

Storm and the Dock failure if said failure stemmed from a breach of its warranties to the Town or

defects in the work performed and materials supplied by AGM's subcontractor.

## II.      THE POLICY PROVIDES COVERAGE FOR DAMAGES TO THE DOCKS AND PROJECT AND AGM'S MITIGATION COSTS.

Under Massachusetts law[1], the interpretation of an insurance contract is a matter of law

for the trial judge to determine. Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146

(1982). "[W]hen terms of an insurance policy are plainly expressed and free from ambiguity, a

court must construe them in their usual and ordinary sense." McQuade v. Nationwide Mut. Fire

Ins. Co., 587 F. Supp. 67, 68 (D. Mass. 1984). Insurance policies must also be construed

"according to the fair and reasonable meaning of the words in which the agreement of the parties

is expressed." MacArthur v. Mass. Hosp. Serv., Inc., 343 Mass. 670, 672 (1962) (internal

quotation marks omitted) (quoting Koshland v. Columbia Ins. Co., 237 Mass. 467, 471 (1921)).

Ambiguity in the language of an insurance contract is not created simply because a controversy

exists between the parties, each favoring an interpretation contrary to the other. Lumbermens

Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995). However, if any ambiguity

is present in the terms of the insurance contract, "doubts as to the intended meaning of the words

must be resolved against the insurance company that employed them and in favor of the

---

[1] Where the state law is being adopted by the federal court under its admiralty jurisdiction, and not simply as an exercise of diversity jurisdiction, a federal choice of law rule must be applied in choosing which state substantive law should be adopted. See State Trading Corp. v. Assuranceforeningen Skuld, 921 F.2d 409 (2nd Cir.1990). The First Circuit has adopted the "significant contacts or nexus test" to determine the appropriate choice of law in the instant case. In re Litigation Involving Alleged Loss of Cargo from Tug Atlantic Seahorse, Sea Barge 101 Between Puerto Rico and Florida in Dec. 1988, 772 F.Supp. 707, 711 (D.Puerto Rico 1991); see also Illinois Constructors Corp. v. Morency & Assoc., Inc., 802 F.Supp. 185, 188 (N.D.Ill.1992) ("Federal courts sitting in admiralty apply the law of state with the most significant relationship to the dispute."). The contacts significant to the dispute are all with Massachusetts. The Defendant insured corporation, is incorporated and has its principal place of business here, the damage for which coverage is sought occurred here and the insurance policy was issued to cover properties and projects located in Massachusetts. Accord Szafarowicz v. Gotterup, 68 F.Supp.2d 38, 43 (D.Mass. 1999).

insured." August A. Busch & Co. v. Liberty Mut. Ins. Co., 339 Mass. 239, 243 (1959); see also

John Beaudette, Inc. v. Sentry Ins., 94 F. Supp. 2d 77, 137 (D. Mass. 1999) (Massachusetts law).

Policy language should be construed "with a view to whether an objectively reasonable insured

would expect to be covered." John Beaudette, 94 F. Supp. 2d at 135.

Under Massachusetts law, the duty to defend is generally determined by the "pleadings

test," which requires the trial court to look at the allegations contained in the complaint, and if

the pleadings disclose facts that bring the case within or potentially within the coverage of the

insurance policy, the insurer has an unequivocal duty to defend, irrespective of whether the

insured will ultimately prevail on the merits. Liberty Mut. Ins. Co. v. SCA Servs., Inc., 412

Mass. 330, 335 n.4 (1992); Terrio v. McDonough, 16 Mass. App. Ct. 163, 167 (Mass.App.Ct.

1983). Any uncertainty as to whether the pleadings include or are reasonably susceptible to an

interpretation that they state a claim covered by the policy terms are resolved in favor of the

insured and the insurer must undertake the defense. Continental Casualty Co. v. Gilbane Bldg.

Co., 391 Mass. 143, 146-147 (1984); Sterilite Corp. v. Continental Casualty Co., 17

Mass.App.Ct. 316, 318 (1983).

### A.   As A Matter Of Law, An Occurrence Happened Which Is Explicitly Covered By The Policy.

As defined in the Policy, an "Occurrence" means an accident, which such term has been

interpreted to constitute an unexpected happening without intention or design. See Policy at

Section 8, ¶ 14; Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81 (1984). A fortuitous

event is "an event which so far as the parties to the contract are aware, is dependent on chance."

Compagnie des Bauxites de Guinee v. Insurance Co. of North Am., 724 F.2d 369, 372 (3rd Cir.

1983) (quoting RESTATEMENT OF CONTRACTS § 291 comment a (1932)).  Stated differently, an

accident constitutes a fortuitous event, one that is unplanned and unintentional in nature.

Compagnie des Bauxites, 724 F.2d at 372; Standard Structural Steel Co. v. Bethlehem Steel

Corp., 597 F. Supp. 164, 193 (D.C. Conn. 1984) ("A fortuitous event is one which occurs

accidently, as a layman, and not a technician or scientist would understand the term.").

The instant case clearly involves a fortuitous event -- namely, a severe winter storm that

was unplanned and unintentional and which damaged the Docks installed by AGM and

manufactured by its subcontractor. It is undisputed that, when AGM entered into the Contract,

no party had a reasonable expectation that such a storm would occur that could damage the

Docks or that the Docks were manufactured in such a way that they could not withstand the

Storm. See Mikutowicz Aff. at ¶ 20. The Owner, AGM and its subcontractor (and, presumably,

the Plaintiff insurer) assumed that the design for the floating docks and specifications for the

Contract were adequate; otherwise, the Owner would not have permitted construction to begin,

AGM would not have installed the Docks, the subcontractor would not have constructed the

Docks, and the insurers would not have issued the Policy. See Mikutowicz Aff. at ¶ 21.

An "occurrence" may also be found in the failure of a party on a construction project to

perform work in accordance with specifications. See L-J, Inc. v. Bituminous Fire and Marine

Ins. Co., 567 S.E.2d 489 (S.C. App. 2002)(finding that a road that failed to drain properly due to

improper sub-road preparation by a subcontractor was a covered "occurrence" under the

products-completed operations hazard coverage of a CGL policy with damages to the road

surfaces recoverable where the work in question was performed by a sub-contractor); Fidelity &

Deposit Co. of Maryland v. Hartford Casualty Ins. Co., 189 F.Supp.2d 1212 (D.Kan

2002)(holding that damages resulting from faulty or negligent workmanship constitutes an

occurrence as long as the insured did not intend for the damage to occur). Furthermore, the

subcontractor's failure to manufacture the Docks in accordance with the specifications

constitutes an unintended, unexpected and unforeseen event which also constitutes a fortuitous event, i.e., an "occurrence" under the Policy.  See Green Constr. Co. v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania, 771 F.Supp 1000, 1003 (W.D. Mo. 1991)(finding that an "occurrence" under a CGL policy includes those fortuitous events that happen without intention or design and are unexpected and unforeseen and finding coverage for soil settling causing damage to a structure); Honeycomb Systems, Inc. v. Admiral Ins. Co., 567 F. Supp. 1400 (D. Me. 1983)(equipment manufacturer entitled to coverage under CGL policy where a defect in a part manufactured by the Assured was an unintended and unexpected occurrence under the policy).

Thus, as a matter of law, the Storm and damages to the Docks and the Project constitutes an "occurrence" under the terms of the Policy for which AGM is entitled to coverage.  Moreover, the subcontractor's alleged failure to comply with design specifications, warranties or other contractual obligations, if proven, would constitute an independent "occurrence" for which AGM would be entitled to coverage under the Policy.

### B.     As A Matter Of Law, AGM Suffered "Property Damage."

The Policy at issue in this case provides coverage for "property damage," defined as "physical damage to tangible property, including all resulting loss of use of that property."  In this case, there is no dispute that the completed work, the installed Docks, suffered direct physical damage resulting from the storm and the alleged noncompliance with the specifications and/or warranty.  See Mikutowicz Aff. at ¶ 8, 9.  Moreover, the failure of the Docks has damaged other portions of the work and caused damages, as well as loss of use to the Town as a result of its inability to operate the marina.  See Mikutowicz Aff. at ¶ 10-13.

Furthermore, the fact that the property damage occurred to a portion of overall Project that was the Assured's Work does not render coverage inapplicable, as it has been held that damage to a subcontractor's or supplier's work which is a part of a larger project does not result in a finding of no "property damage." See Marathon Plastics, Inc. v. International Ins. Co., 514 N.E.2d 479 (Ill.App. 1987)(denying Insurers claim that only damage was to Assured's work, as the damaged water pipes were part of a larger "new product" that included the Assured's work); Imperial Casualty & Indemnity Co. v. High Concrete Structures, Inc., 858 F.2d 128 (3rd Cir. 1988)(finding that insured's product was changed in size, shape and value, thus creating a new product that was not the assured's work); Aetna Casualty and Surety Co. v. M&S Indus., Inc., 827 P.2d 321 (Wa. Ct. App. 1992)(finding defects in assured's product affected an entire system and project, resulting in damage to the property owner). "When a defective product is so intertwined with the entire mechanism that the defect and its subsequent removal necessarily resulted in damage to the completed product, property damage occurs for the purposes of a general liability policy." Travelers Ins. Companies v. Penda Corp., 974 F.2d 823 (7th Cir. 1992). Thus, the Court may look to the ultimate effect of the incorporation of a defective item in determining that there is damage to property other than the Assured's work.

The damage caused by the Storm and the alleged noncompliance with the contract and specifications by the Docks' manufacturer was a risk of physical loss and property damage expressly contemplated by the Policy. Not only were the Docks themselves damaged, but the damage affected the entire Project, resulting in significant damages to Town, not expressly limited to the replacement of the Docks. These damages, to the Docks and the entire marina Project, constitute "property damage" as contemplated by the Policy. Accordingly, the claims

asserted by the Town and the costs incurred by AGM as a direct result of the Storm and the damage to the Docks, if proven, are covered as a matter of law.

### 1.  AGM is entitled to recover its expenses incurred to prevent further insured losses costs under the Policy

AGM was required by the Town to dispatch emergency crews to secure and remove those Docks that had broken loose and were floating free (posing as a hazard in navigable waters) as well as the remaining damaged Docks, the purpose of which was to respond to a clear and present danger and prevent not only further losses, but to eliminate any further maritime hazards if the damaged Docks broke free. See Mikutowicz Aff. at ¶ 10-13. As the marina was inoperable without the Docks, the Town demanded and AGM was required to provide and attach temporary docking facilities to reduce and mitigate the loss of use suffered by the Town. See Mikutowicz Aff. at ¶ 16.

Section 7(2)(c) of the Policy requires that in the event of an occurrence, the Assured must "take such steps to minimize and avoid liability, before and after any casualty or occurrence, as would be taken by a prudent uninsured person... ." Thus the Policy expressly contemplates that an insured will take all reasonable steps to reduce and mitigate the covered damages. In this case, AGM's actions in preventing property damages to boats and other structures in the marina were not only reasonable, but were required by the express terms of the Policy and had the effect of reducing the potential liability of American under the Policy.

Public policy also dictates that the Insurers provide coverage for the costs of measures taken to prevent further and more expensive losses and to therefore reduce the claims that must ultimately be paid by the Insurers. Intel Corporation v. Hartford Accident and Indemnity Company, 692 F. Supp. 1171, 1192 (N.D.CA. 1988)(public policy requires coverage for investigation and response costs in mitigation of damage); Bankers Trust Co. v. Hartford

Accident and Indemnity Company, 518 F. Supp. 371, 373 (S.D.N.Y. 1981)(court found that

work done on property to prevent further oil seepage was, as a matter of law, within the

comprehensive liability policy's coverage)(vacated after settlement). Thus, AGM's actions in

dispatching crews to capture the loose Docks as well as to remove the damaged Docks that had

not yet broken free eliminated insured potential liabilities that would otherwise likely have been

suffered due to the hazard the Docks represented to navigation and vessels in navigable waters.

The damages claimed by AGM arose naturally and directly from the damage to the

Docks, the Project and AGM's reasonable efforts to reduce and minimize the damages suffered

as a result of the Docks' failure. As the Policy and public policy set forth that an assured is to

take reasonable, proactive steps to mitigate loss, AGM's actions in this case to secure the loose

docks and comply with the Town's demand for a temporary pier solution to reduce the loss of

use damages are recoverable damages and losses under the Policy.

### C. AGM Is Entitled To Coverage Because The Work Was Performed By A Subcontractor.

The Plaintiff insurer, in denying AGM's claim for coverage, failed to discuss or

acknowledge the exception to the exclusion for damage to the "Assured's work" when the

damaged work was performed by a subcontractor. Exclusion 2.k. (page 10) excludes coverage

for "'[p]roperty damage' to the 'Assured's work' arising out of it or any part of it and included in

the 'products-completed operations hazard'." Exclusion 2.k goes on to state that "this exclusion

does not apply if the damaged work or the work out of which the damage arises was performed

on the Assured's behalf by a subcontractor." In other words, coverage for replacement or repair

of property or completed work because AGM's subcontractor's work was, allegedly, deficient,

or because AGM's subcontractor breached its warranties or representations is explicitly included in coverage.[2]

While Policy does not define a "subcontractor," in the case of Nat'l Union Fire Ins. Co. v. Structural Sys. Tech., Inc., 756 F.Supp. 1232 (E.D. Mo. 1991), the Court explained the meaning of "subcontractor" for the purposes of the exclusion to the "Assured's work" exception to coverage in a Commercial General Liability policy:

> The policy does not define "subcontractor." Webster defines subcontract as "a contract that assigns some of the obligations of a prior contract to another party," and subcontractor as "one that enters into a subcontract and assumes some of the obligations of the primary contractor." Similarly, subcontractor also is defined as "One who takes [a] portion of a contract from [the] principal contractor or another subcontractor," and "One who has entered into a contract, express or implied, for the performance of an act with the person who has already contracted for its performance."

> In determining the applicability of this exception, the Court is guided by several principles of contract construction. First, plain and unambiguous language in an insurance contract must be given its plain meaning. Second, the insurer bears the burden of proving the applicability of an exclusion. And finally, the provisions restricting coverage are construed in favor of the insured and against the insurer.

The Structural Sys. Tech. Court went on to find that a manufacturer of prefabricated steel rods for a tower project was not a supplier, but a subcontractor. See Id., affirmed, 964 F.2d 759, 763 (8th Cir. 1992). Similarly, the manufacturer of a prefabricated, insulated, underground steam pipe was found to be a subcontractor based upon the fact that the item was custom manufactured to the project specifications and the manufacturer provided guidance in connection with the installation of its product. See Limbach Co., LLC v. Zurich American Ins. Co., 396 F.3d 358 (4th Cir. 2005)(per curiam). See also Wanzek Constr., Inc. v. Employers Ins., 679 N.W.2d 322, 329 (Minn. 2004)(holding that a supplier of coping stones for a new swimming pool was a subcontractor for purposes of the "your work" exclusion, since the supplier custom manufactured

---

[2] Such losses are also recoverable if, as here, the Insured opts and pays for optional products-completed operations hazard coverage. See discussion infra at §II(D), pp. 17-20.

the coping stones to the architect's specifications and provided on-site supervision in connection with the installation). The Limbach Court found coverage for the costs of replacing the damaged subcontractor's work to be covered under the CGL policy issued in that case. See Limbach Co., LLC v. Zurich American Ins. Co., 396 F.3d 358 (4th Cir. 2005)(per curiam).

The exclusion for damages to the "Assured's work" when the policy contains the exception for subcontractor's work has been held to not apply to claims for the failure of a component of the Project supplied by a subcontractor. National Union Fire Ins. Co. v. Structural Systems Technology, Inc., 964 F. 2d 759 (8th Cir. 1992)(supplier of structural steel that failed was a subcontractor, and general contractor therefore was entitled to coverage); see also Brosnaham Builders, Inc. v. Harleysville Mutual Ins. Co., 137 F.Supp.2d 517, 528 (D. Del. 2001)(noting that a similarly written exclusion would permit coverage under completed operations endorsement for such a claim if premised upon the failure of a subcontractor's work). Products completed operations hazard endorsements and subcontractor exceptions to policy exclusions have been held to provide coverage for deterioration to roads after completion by general contractors where the defective work was performed by subcontractors. See, e.g. L-J, Inc. v. Bituminous Fire and Marine Inc. Co., 567 S.E.2d 489 (S.C. Ct. App. 2002); CU Lloyd's of Texas v. Main Street Homes, 79 S.W.3d 687 (Tex. Ct. App. 2002).

Under the plain reading of the Policy and the undisputed facts before this Court, AGM is entitled to coverage for the property damage and loss of use allegedly suffered by the Town that arises from the alleged breach of warranty in connection with the Docks provided by AGM's subcontractor. In light of the above-described precedent and interpretation of the term "subcontractor" under a CGL policy, there can be no principled debate that the Docks were supplied by AGM's "subcontractor." Southeast was charged with the responsibility of reviewing

the Project specifications, including the design and performance specifications and requirements, and manufacturing of a dock system that complied therewith. See Mikutowicz Aff. at ¶ 4. Not only were the Docks a specially manufactured product, i.e., not a stock item, but Southeast provided installation guidelines and instructions. See Mikutowicz Aff. at ¶ 4. The level of involvement and skill involved in the design and manufacturing of the Docks, as well as their being an integral portion of the Project, renders Southeast a subcontractor and the damage to the Docks, and AGM and the Town's associated losses and damages, covered under the Policy.

### D. AGM Is Entitled To Coverage Under The Products-Completed Operations Hazard Coverage.

Notwithstanding the foregoing, AGM is independently entitled to coverage under the Products-Completed Operations Hazard coverage it purchased as part of the Policy and for which it paid a significant premium. See Mikutowicz Aff. at ¶ 22. Completed Operations Coverage protects the insured from liability for damages caused by faulty or defective work. See, e.g., Green Constr. Co. v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania, 771 F.Supp 1000, 1004 (W.D. Mo. 1991)(affording coverage to contractor under completed operations endorsement for damage to construction project as a result of soils settling due to subcontractor/consultant's erroneous measurements). Massachusetts courts construe exclusions against insurers, Ferrara & DiMercuri, Inc. v. St. Paul Insurance Co., 169 F.3d 43, 49-50 (1st Cir. 1999); Camp Dresser & McKee, Inc. v. Home Insurance Co., 30 Mass. App. Ct. 318, 323 (1991), and in the manner most likely to provide coverage to insureds. See John Beaudete, Inc. v. Sentry Ins. A Mutual Company, 94 F. Supp. 77, 137 (D. Mass. 1999); see also GRE Ins. Group v. Metro. Boston Hous. P'ship, Inc., 61 F.3d 79, 81 (1st Cir.1995) (under Massachusetts law, insurer bears burden of proof on exclusions). AGM's services, labor and materials, including warranties and representations, fall within the Policy's definitions of the "Assured's work."

17

Furthermore, as the property damage suffered by AGM occurred away from premises AGM owns or rents and concerned AGM's completed work, the property damage falls within the coverage provided by the Product-Completed Operations Hazard clauses of the Policy.

Policy Exclusion 2.i(6) excludes coverage for damage to property resulting from the "Assured's work" having been incorrectly performed on the property. However, the Policy states at the end of Exclusion 2.i. that it does "not to [apply] to property damage included in the 'products-completed operations hazard.'" In other words, coverage for replacement or repair of property because AGM's or its subcontractor's completed work was deficient, or because AGM or its subcontractor breached their warranties or representations - - including warranty of fitness for a particular purpose - - is part of the optional coverage purchased for Products-Completed Operations Hazard. See Brosnaham Builders, Inc. v. Harleysville Mutual Ins. Co., 137 F.Supp.2d 517, 528, n.10 (D. Del. 2001)(noting that a similarly written exclusion does not apply to completed work and would permit coverage under completed operations endorsement for such a claim). When this exclusion is read together with the "Products-Completed Operations Hazard" provision, "the result is that this exclusion does not apply to claims arising from defective work that is discovered after the contractor has completed its work." American States Inc. Co. v. Powers, 262 F.Supp.2d 1245 (D.Kan. 2003).

Similarly, Exclusion 2.k. (page 10) excludes coverage for "'[p]roperty damage' to the 'Assured's work' arising out of it or any part of it and included in the 'products-completed operations hazard'." What this states, in its Byzantine way, is that property damage to the Assured's work arising out of it or any part of it is included within the optional Products-Completed Operations Hazard coverage, and that the exclusion is, therefore, not applicable and coverage exists if the optional protection is purchased. Compare Trinity Universal Ins. Co. v.

Broussard, 932 F.Supp 1307, 1310 (N.D. Okla. 1996)(denying coverage under a similarly written exclusion when no completed operations coverage was purchased). Property damage resulting from a product that failed to meet specifications or representations was, for example, found to be covered under the products-completed operations coverage of a CGL policy, Gaylord Chemical Corp. v. ProPump, Inc., 753 So.2d 349 (La. Ct. App. 1st Cir. 2000)(finding coverage for claims of loss resulting from the failure of a pump to meet the specifications and warranties of the insured), as were damages to a house resulting from negligent pile-driving work. Rando v. Top Notch Properties, L.L.C., 879 So.2d 821 (La. Ct. App. 4th Cir. 2004)(finding alleged construction defects relating to pile driving work to be within the products-completed operation hazard coverage of a CGL policy).

Where, as here, the Policy does not provide separate exclusions for the Completed Operations coverage, any ambiguities must be resolved against the insurance company that employed them and in favor of the insured. August A. Busch & Co. v. Liberty Mut. Ins. Co., 339 Mass. 239, 243 (1959)(ambiguities must be resolved against the insurance company that employed them and in favor of the insured); see also John Beaudette, Inc. v. Sentry Ins., 94 F. Supp. 2d 77, 137 (D. Mass. 1999) (Massachusetts law). Policy language should be construed "with a view to whether an objectively reasonable insured would expect to be covered." John Beaudette, 94 F. Supp. 2d at 135. In this case, the add-on completed operations coverage is inconsistent with American's interpretation of the discussed exclusions and coverage for AGM must be found.[3]

---

[3] At worst, an ambiguity in the Policy may be found where the only provision in the Policy relating to the add-on Products-Completed Operations coverage is, as here, in the definitions section. See Kidd v. Logan M. Killen, Inc., 640 So.2d 616 (La. Ct. App. 1st Cir. 1994)(superseded by statute on other grounds). The Kidd decision was cited favorably in finding coverage was provided under a policy that clearly provides for products-completed operations coverage and then attempts to exclude such coverage for "'[p]roperty damage' to the 'Assured's work' arising out of it or any part of it and included in the 'products-completed operations hazard'" resulting in an

When an insured intended to purchase coverage for exposure after completion of work of the type the insurer later claims is excluded under a policy's exclusions, the Court may, under the facts and circumstances, in view of all provisions of the Policy, find an ambiguity and consider that an intelligent businessman would, in all likelihood, not purchase liability insurance under a policy which excluded that type of completed operations hazard to which he was substantially exposed. See Kammeyer v. Concordia Tel. Co., 446 S.W.2d 486 (Mo. App. 1969); see also Peerless Inc. Co. v. Clough, 193 A.2d 444 (NH 1963)(finding coverage for fires resulting from alleged negligence in construction, where confusing and misleading statements would not lead insured to understand that the completed operations coverage he purchased for such types of risk was excluded). Ambiguities are to be strictly construed against insurers, particularly with respect to exclusionary provisions. Hakim v. Massachusetts' Insurers' Insolvency Fund, 424 Mass. 275 (1997); Mt. Airy Ins. Co. v. Greenbaum, 127 F.3d 15, 18 (1st Cir. 1997). Therefore, even if the Policy and exclusions thereunder were susceptible to more than one rational interpretation, as guided by Kidd, Mike Hooks, and Rando, this Court would be required to enter partial summary judgment in favor of AGM.

---

ambiguity in the policy as to the extent of coverage. Mike Hooks, Inc. v. Jaco Services, Inc., 674 So.2d 1125 (La. Ct. App. 3rd Cir. 1996). Mike Hooks noted that the policy at issue, like AGM's policy, made reference to the products-completed operation coverage only in the definition section and some exclusions asserted by the Insurer in the present action. Id. As a result of the insurer's inability to point out an unambiguous provision addressing what the purchased products-completed operations endorsement encompassed, the policy was interpreted in light of favoring coverage. Id. At 1128. To find otherwise would, in effect, negate the completed operations coverage, rendering the coverage purchased useless and illusory. Gaylord Chemical Corp. v. ProPump, Inc., 753 So.2d 349 (La. Ct. App. 1st Cir. 2000)(citing Kidd and Mike Hooks in finding ambiguity in policy and reversing summary judgment). A careful reading of the policy is clearly critical to the outcome of an insurance case involving completed operations coverage. Rando v. Top Notch Properties, L.L.C., 879 So.2d 821, 824 (La. Ct. App. 4th Cir. 2004)(citing Kidd and Mike Hooks and finding coverage where ambiguity in policy work-product exclusion conflicted with completed-operations endorsement).

## CONCLUSION

For the reasons set forth above, AGM respectfully requests that this Court issue an order

granting partial summary judgment in favor of AGM declaring that American must (i) defend

AGM for the claims asserted by the Town; (ii) indemnify AGM for any recovery by the Town;

and (iii) reimburse AGM for the costs and expenses incurred by AGM in order to prevent

insurable losses under the Policy. For the Court's convenience, a form of Proposed Order is

attached to AGM's Motion.

Respectfully submitted,

AGM MARINE CONTRACTORS, INC.

By its attorneys,

Eric Eisenberg, Esq. (BBO #544682)
Jeremy Blackowicz, Esq. (BBO #650945)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109-1775
(617) 345-9000

DATED: April 22, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on this 22 day of April, 2005, I have served a true copy of the above
document, via first-class mail, postage pre-paid, to the following counsel of record:

Robert Murphy, Esq.
Holbrook & Murphy
150 Federal Street
Boston, MA 02110

Jeremy Blackowicz