## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**AMERICAN HOME**
**ASSURANCE COMPANY,**
    **Petitioner**

                             **CIVIL ACTION**
v.                              **NO.: 04-11382-EFH**

**AGM MARINE CONTRACTORS, INC.**
    **Respondent**


## AMERICAN HOME ASSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO AGM MARINE CONTRACTORS INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT;

## AMERICAN HOME ASSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT


AMERICAN HOME ASSURANCE
COMPANY
By its attorneys,

Robert J. Murphy, BBO# 557659
HOLBROOK & MURPHY
150 Federal Street, 12th Floor
Boston, MA 02110
617-428-1151

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………….….i

STATEMENT OF UNDISPUTED MATERIAL FACTS…………………......1

ARGUMENT…………………………………………………………….…….7

THE AMERICAN HOME COMMERCIAL MARINE LIABILITY POLICY DOES NOT PROVIDE COVERAGE FOR DAMAGES WHICH AROSE ENTIRELY FROM FAULTY WORK

    A.  Interpretation and Construction of an Insurance Policy…………….7

    B.  A Commercial Marine Liability Policy, Such as the American Home Policy, Is Not Intended as a Guarantee of the Insured's Work ……………...…8

    C.  There is No Coverage Under the Insuring Agreement………………11

    D.  Exclusionary Clauses: General Principles of Construction……...….15

    E.  Exclusions in the Policy Preclude Coverage…………………….......16

        1.    The Policy Excludes Coverage for Property Damage to the Assured's Product Arising Out of it or Any Part of it…....16

        2.    The Policy Excludes Coverage for Property Damage to the Assured's Work Arising Out of it or Any Part of it….....…19

CONCLUSION………………………………………………………………23

## **TABLE OF AUTHORITIES**

### **CASES**

American Home Assurance Company v. Fore River Dock & Dredge, Inc., 321 F.Supp.2d 209 (D. Mass. 2004)

Bond Bros., Inc. v. Robinson, 393 Mass. 546, 471 N.E.2d 1332 (1984)

Citations Ins. Co. v. Gomez, 426 Mass. 379 (1998)

Coakley v. Maine Bonding & Cas. Co., 136 N.H. 402, 618 A.2d 777 (1992)

Commerce Ins. Co. v. Betty Caplette Builders, Inc., 420 Mass. 87 (1995)

Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143 (1984)

Davenport v. USF & G, 56 Mass. App. Ct. 1109, 778 N.E.2d 1038 (2002)

Donovan v. Commercial Union Ins. Co., 44 Mass. App. Ct. 596 (1998)

Dorchester Mut. Fire Ins. Co. v. First Kostas Corp., Inc., 49 Mass. App. Ct. 651 (2000)

Frankel v. J. Watson Co., 21 Mass. App. Ct. 43 (1985)

Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 675 N.E.2d 1161 (1997)

Harbor Court Assoc. v. Kiewit Construction Co., 6 F.Supp.2d 449 (D.Md. 1988)

Heile v. Herrmann, 136 Ohio App.3d 351, 736 N.E.2d 566 (1999)

Indiana Ins. Co. v. DeZutti, 408 N.E.2d 1275 (Ind. 1980)

Knutson Construction Co. v. St. Paul Fire & Marine Ins. Co., 396 N.W.2d 229 (Minn 1986)

Krapf v. Krapf, 439 Mass. 97 (2003)

Lerner Corp. v. Assurance Co. of America, 120 Md. App. 525, 707 A.2d 906 (1988)

Lusalon Inc. v. Hartford Ace & Indemnity Co., 400 Mass. 767 (1987)

Maher v. Chase, 52 Mass. App. Ct. 22 (2001)

Matthews v. Bloomfield, 246 Mass. 510 (1923)

i

Money Store/Massachusetts, Inc. v. Hingham Mut. Fire Ins. Co., 430 Mass. 298 (1999)

Pursell Construction, Inc. v. Hawkeye-Security, Ins. Co., 596 N.W.2d 67 (1999)

R.N. Thompson & Associates, Inc. v. Monroe Guaranty Ins. Co., 686 N.E.2d 160 (1997)

Reliance Ins. Co. v. The Escapade, 280 F.2d 482 (5th Cir. 1960)

Sapp v. State Farm Fire & Cas. Co., 486 S.E.2d 71 (GA. Ct. App. 1997)

Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. 422 (1995)

Standard Fire Ins. Co. v. Chester-O'Donely & Associates, Inc., 972 S.W.2d 1 (1998)

Sterilite Corp. v. Continental Cas. Co., 17 Mass. App. Ct. 316 (1983)

Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844, 616 N.E.2d 68 (1993)

United States Fidelity & Guaranty Corp. v. Advance Roofing & Supply Co., Inc., 163 Ariz. 476, 788 P.2d 1227 (Az. Ct. App. 1989)

Weedo v. Stone-E-Brick, Inc., 81 N.J. 233 (1979)

## TREATISES AND OTHER AUTHORITIES

9 Couch on Insurance § 129 (3rd ed. 1996)

33 Tort & Ins. Law Journal 257 (Fall, 1997)

Comprehensive General Liability Insurance- Perspective and Overview, 25 Fed'n Ins. Couns., Q. 217 (Tinker 1975)

ii

## STATEMENT OF UNDISPUTED MATERIAL FACTS

At all times pertinent hereto, the Petitioner, American Home Assurance Company (hereinafter "American Home") was a corporation duly organized and existing by virtue of the laws of the State of New York, with a principal place of business at 70 Pine Street, New York, New York. American Home is in the business of, *inter alia*, providing commercial marine liability insurance. (See generally, Petition for Declaratory Judgment).

Upon information and belief, at all times pertinent hereto, the Respondent, AGM Marine Contractors, Inc. (hereinafter "AGM" or "the Assured"), was a corporation duly organized and existing by virtue of the laws of the Commonwealth of Massachusetts, with a principal place of business at 30 Echo Road, Mashpee, Massachusetts. AGM is in the business of marine construction. (See generally, Petition for Declaratory Judgment; Respondent's Answer to Petition for Declaratory Judgment).

The Respondent, AGM, and the Petitioner, American Home, entered into a contract of marine insurance, Policy No. B2291, in Boston, Massachusetts, whereby American Home agreed to insure AGM pursuant to the policy's terms, conditions and limitations, against certain perils for the period January 1, 2003 to January 1, 2004. (Commercial Marine Liability Policy B2291, attached hereto as Exhibit 1).

The commercial marine liability insurance policy issued to AGM is a *liability* policy. As such, it does not provide a guarantee for the Assured's faulty workmanship. Indeed, the policy's exclusions make clear that the policy does not cover an incident of faulty workmanship, but rather only faulty workmanship which caused an accident to a

1

third party for which the Assured would be liable. Faulty workmanship, standing alone, does not constitute an "occurrence" as defined in the American Home Policy. The cost to repair the defective work does not constitute property damage. (See, Exhibit 1, Commercial Marine Liability Policy B2291, at p.9-10).

The Town of Provincetown (or the "Town") owns MacMillian Pier which is located off Lopes Square, Commercial Street, Provincetown, Massachusetts, along the northern shore of Provincetown Harbor, Cape Cod Bay. (See Exhibit 2, survey report of Wiggin Marine, including attached NOAA chart).

On or about October 16, 2000, the Town contracted with AGM for the reconstruction of MacMillian Pier. Among other things, the contract required AGM to perform the work required by the contract documents for the removal and disposal of the existing pier, and the construction of a new steel pile-supported pier. The contract also required AGM to install a concrete floating dock system. It is damage to the concrete floating dock system, which is the subject matter of this litigation.

The total contract price for all of the work under the contract was $15,576,721.25. Installation of the concrete floating dock system represented $469,000 of the contract price. (Owner Contractor Agreement attached as Exhibit 3; Survey report of Wiggin Marine attached as Exhibit 2).

On or about February 12, 2002, AGM purchased the concrete floating docks from Southeast Floating Docks Inc., of St. Augustine, Florida (hereinafter Southeast Floating Docks). (See AGM Purchase Order 7200-14 attached as Exhibit 4). AGM's Purchase Order identifies Southeast Floating Docks as a "vendor." The purchase order calls for the floats to be delivered "sub-assembled," and shipped by Southeast Floating Docks from

2

Florida to AGM at the job site in Provincetown, Massachusetts. The Southeast Floating

Docks literature indicates that the "float system is intended for protected installations

such as exist behind a permanent fixed wave attenuator...." (Southeast Floating Docks

literature attached as Exhibit 5). A floating wave attenuator was proposed for installation

off the offshore ends of the "A" and "B" Docks, but it was later withdrawn from the

project, apparently due to funding and cost considerations. (Survey report of Wiggin

Marine attached as Exhibit 2).

AGM installed the concrete floating docks on the north side of MacMillian Pier at

the approximate mid-point of the pier. The "A" Dock is the inshore set of floating

concrete docks and the "B" Dock is the offshore set. The floating docks run more or less

perpendicular to MacMillian Pier. (Survey report of Wiggin Marine attached as Exhibit

2).

The concrete floating docks were discovered damaged on Sunday, December 7,

2003. A winter storm had been in the area from December 5 through December 7, 2003.

Reportedly, the concrete floating docks began to fail early in the day on December 6,

2003, well before the peak of the storm. Information provided by AGM confirms that the

wave heights and wind speeds during the storm did not exceed the design specifications

by the project engineer. The docks thus had been designed to withstand the weather that

occurred. (Correspondence of Kopelman and Paige, P.C. dated June 3, 2004, attached as

Exhibit 13).

The damage was confined to the floating docks themselves. (Survey report of

Wiggin Marine attached as Exhibit 2). There were no vessels moored at the floating

3

docks at the time the damage occurred, and there are no claims of bodily injury or property damage aside from the damage to the floating docks themselves. Id.

On or about December 9, 2003, representatives of the Town of Provincetown contacted AGM with regard to the damaged concrete dock system installed by AGM. The Town alleged that AGM "failed to install the floating dock system in accordance with the design specifications" and that AGM is obligated to indemnify the Town for damage to the floating dock system in accordance with a contractual agreement between AGM and the Town. (Correspondence of December 9, 2003, attached hereto as Exhibit 7). Notice of the Town's claim was not provided to American Home until March 30, 2004. (American Home's Denial Letter attached hereto as Exhibit 8).

On March 10, 2004, attorneys representing the Town of Provincetown wrote to counsel for AGM, blaming the dock's failure on AGM's faulty installation. The letter set forth:

> AGM failed to install the floating dock system in accordance with the design specifications. In particular, the observations analysis indicates that, at the time of failure of the system, the wave heights and wind velocity were well below the design wave height and wind velocity. It appears that AGM failed to adequately calculate and report to the Town the ability of the floating dock system to sustain loads and stresses indicated in the specifications. As a result excessive loading at the point where the finger piers meet the main pier caused the system to fail. (Correspondence of March 10, 2004 attached hereto as Exhibit 9).

AGM has settled the Town's claims. (Correspondence of Attorney Eisenberg dated May 5, 2005, attached as Exhibit 10). Pursuant to the settlement, AGM is required to replace only a portion of the failed dock system. (Town of Provincetown's Memorandum attached as Exhibit 6). AGM has estimated the cost of this work to be

4

$200,000. (Correspondence of Attorney Eisenberg dated May 5, 2005, attached as

Exhibit 10).

AGM has initiated arbitration against Southeast Floating Docks alleging that the

"[c]oncrete floating dock system provided by supplier was defective and requires

replacement." (AGM Demand for Arbitration attached as Exhibit 11). AGM's Demand

for Arbitration indicates that the amount of its claim is $250,000. Id.

## PERTINENT PROVISIONS OF THE INSURING AGREEMENT

The American Home Insuring Agreement provides:

1.    INSURING AGREEMENT

a.    The Company will pay those sums that the Assured becomes legally
      obligated to pay as damages because of ..."property damage" to which
      this insurance applies....However, the Company will have no duty to
      defend the Assured against any "suit" seeking damages for ..."property
      damage" to which this insurance does not apply....

b.    This insurance applies to ..."property damage" only if:
      (1)    The..."property damage" is caused by an "occurrence" that takes
             place in the "coverage territory"

The policy defines occurrence as:

14.    "Occurrence" means an accident, including continuous or repeated
       exposure to substantially the same general harmful conditions.

The qualifying phrase "to which this insurance applies" emphasizes the basic

notion that the policy purchased by the Assured does not buy coverage for *all* property

damage, but only for that type of damage expressly provided for, and not excluded by,

the provisions of the policy.

The American Home liability policy also provides coverage for "products-

completed operations hazards," as defined by Section 8, Paragraph 17, which pertains to

5

covered hazards occurring after completion of the job. More particularly, it is coverage

for property damage which falls within the provisions of the Insuring Agreement (Section

1), is not excluded by an exclusion (Section 2), occurs away from the insured's premises,

and is caused by the insured's work after that work has been completed. 9 Couch on

Insurance § 129:14 (3rd ed. 1996).

Section 2 of the policy contains various provisions *excluding* coverage for

damage arising out of AGM's own work due to its faulty workmanship or due to its

failure to perform the contract from which the damage arose. The Policy contained the

following exclusions:

2.    **EXCLUSIONS**

This insurance does not apply to:

j.    **Damage to The Assured's Product**

"Property damage" to "the Assured's product" arising out of it or
any part of it.

k.    **Damage to the Assured's Work**

"property damage" to "the Assured's work" arising out of it or any
part of it and included in the "products-completed operations
hazard".

The policy broadly defines "the Assured's product" as follows:

"The Assured's Product" means:

a.    Any goods or products, other than real property, manufactured,
sold, handled, distributed or disposed of by…[t]he Assured.

"the Assured's product" includes:

(1)    Warranties or representations made at any time with respect to the
fitness, quality, durability, performance or use of "the Assured's
product" and,

6

(2)     The providing of or failure to provide warnings or instructions.

Similarly, the policy broadly defines "the Assured's work" as follows:

"The Assured's work" means:

a.      Work or operations performed by the Assured or on the Assured's
        behalf; and

b.      Materials, pads or equipment furnished in connection with such
        work or operations.

"the Assured's work" includes:

a.      Warranties or representations made at any time with respect to the
        fitness, quality durability performance or use of the Assured's
        work" and,

b.      The providing of or failure to provide warnings or instructions.

American Home respectfully submits that this Honorable Court should find that

the liability policy does not provide coverage for AGM's alleged faulty workmanship and

that a reasonable assured would not have expected the liability policy to serve as a

guarantee of the insured contractor's work.

## ARGUMENT

### THE AMERICAN HOME LIABILITY POLICY DOES NOT PROVIDE COVERAGE FOR DAMAGES WHICH AROSE ENTIRELY FROM FAULTY WORK

A       INTERPRETATION AND CONSTRUCTION OF AN INSURANCE
        POLICY

The interpretation of a contract is a question of State law to be decided by the

court. Krapf v. Krapf, 439 Mass. 97, 105 (2003); Dorchester Mut. Fire Ins. Co. v. First

7

Kostas Corp. Inc., 49 Mass.App.Ct. 651, 653 (2000). Under Massachusetts law, the

Courts construe an insurance policy under the general rules of contract interpretation.

Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998); Hakim v. Massachusetts Insurers'

Insolvency Fund, 424 Mass. 275, 675 N.E.2d 1161, 1164 (1997). "This is consistent with

our long-standing policy that the rules governing the interpretation of insurance contracts

are the same as those governing the interpretation of any other contract." Money

Store/Massachusetts, Inc., v. Hingham Mut. Fire Ins. Co., 430 Mass. 298, 301 (1999),

quoting Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. 422, 427 (1995).

Unambiguous language is given its natural and ordinary meaning. Maher v.

Chase, 52 Mass.App.Ct. 22, 24 (2001), citing Coakley v. Maine Bonding & Cas. Co., 136

N.H. 402, 410, 618 A.2d 777 (1992). If there is no ambiguity, the court should construe

the words of the insurance policy in their usual and ordinary sense. Id. The doctrine of

construing the language against the insurance company does not come into play unless a

clause is ambiguous. Id.

As such, the assured, AGM, must demonstrate by the plain language of the policy,

that American Home is obligated to indemnify it for damages arising out of allegedly

defective work. See, Matthews v. Bloomfield, 246 Mass. 510, 512 (1923).

## B.   A COMMERCIAL MARINE LIABILITY POLICY, SUCH AS THE AMERCAN HOME POLICY, IS NOT INTENDED AS A GUARANTEE OF THE ASSURED'S WORK

The American Home policy issued to AGM was a commercial marine liability

policy. Its terms, conditions and exclusions are reminiscent of the more familiar

comprehensive or commercial general liability ("CGL") policy. The American Home

8

policy covered AGM for certain liability to others for damage caused by its work as provided by the policy and not excluded by the policy exclusions. As discussed in greater detail herein below, the American Home liability policy was not intended to, and did not, cover damage to AGM's own work due to its faulty workmanship, or due to its failure to perform the contract from which the damage arose.

"General liability coverage is not intended as a guarantee of the insured's work, and for that reason, general liability policies contain 'business risk' exclusions." Dorchester Mut. Fire Ins. Co. v. First Kostas Corp. Inc., 49 Mass. App. Ct. 651, 654 (2000). Such "business risks" have been described as those which management can and should control or reduce to manageable proportions; risks which management cannot effectively avoid because of the nature of the business operations; and risks which relate to the repair or replacement of faulty work or products.

These risks are a normal, foreseeable and expected incident of doing business and should be reflected in the price of the product or service rather than as a cost of insurance to be shared by others. Id. at 655, citing Sterilite Corp. v. Continental Cas. Co. 17 Mass.App.Ct. 316, 322 n. 13 (1983), quoting Tinker, Comprehensive General Liability Insurance - Perspective and Overview, 25 Fed'n Ins. Couns. Q. 217, 224 (1975).

The consequence of not rendering services properly is a part of every business enterprise. Repairing or replacing faulty work is a business expense properly borne by the insured contractor in order to satisfy customers. Commerce Ins. Co. v. Betty Caplette Builders, Inc., 420 Mass. 87, 92 (1995) citing Weedo v. Stone-E-Brick, Inc. 81 N.J. 233, 239-240 (1979). A contractor can purchase other insurance, perhaps a builder's risk policy or performance bond, to protect against damage to its own work, but a

9

comprehensive general liability insurance policy insures against a different risk, namely, injury to property *other than* the contractor's own work or product. Id. at 92-93. "Insurers certainly did not intend that the standard form of policy providing comprehensive general liability coverage would insure contractual obligations arising from defective workmanship." Bond Bros., Inc. v. Robinson, 393 Mass. 546, 552 (1984), n. 3, citing Weedo v. Stone-E-Brick. Inc., 81 N.J. 233, 239-240 (1979). Most policies of commercial general liability insurance exclude the insured's faulty workmanship from coverage. The rationale for such exclusions is that faulty workmanship is not an insurable "fortuitous event." 9 Couch on Insurance § 129:11 (3rd ed. 1996), citing Bond v. Robinson, *supra*. "The business risk exclusions were designed to make the insured responsible for predictable and limited business risks, while protecting the insured against catastrophe." 33 Tort & Ins. Law Journal 257, 266-67 (Fall, 1997). Unlike the cost attendant to the repair of a contractor's faulty work, the accidental injury to *other* property or persons caused by its unworkmanlike performance exposes the contractor to almost limitless liabilities. The consequences of the two "are vastly different in relation to sharing the cost of such risks as a matter of insurance underwriting." Weedo v. Stone-E-Brick. Inc. 81 N.J. 233, 240 (1979). "To maintain stable and affordable insurance rates, an insurer's risk assumptions must be limited to those *beyond the control of the insured*." 33 Tort & Ins. Law Journal 257, 266-67 (Fall, 1997), citing Commerce Ins. Co. v. Betty Caplette Builders. Inc. *supra*.

It is a normal business risk in the marine construction industry that a docking system will fail if it is improperly manufactured or installed. It is a risk that can be managed by the marine contractor within his business operations, the price he charges for

10

his work, and the manner in which he performs his work. In this case, it was a risk that was squarely within the control of AGM, and not one intended to be covered by the commercial marine liability policy.

## C.    THERE IS NO COVERAGE UNDER THE INSURING AGREEMENT

As a matter of law, if coverage is not found in the insuring agreement, it will not be found elsewhere in the policy. While policy exclusions help define and shape the scope of coverage, they must be read in terms of the insuring agreement to which they apply. Exclusions can only decrease coverage; they cannot increase it. Bond Brothers Inc. v. Robinson, 393 Mass. 546, 471 N.E.2d 1332 (Mass. 1984).

The American Home Policy's Insuring Agreement only provides coverage for property damage caused by accidental, fortuitous occurrences. Controlling precedent in Massachusetts holds that a contractor's obligation to repair or replace its defective workmanship, or the defective workmanship of its subcontractor, should not be deemed "unexpected" on the contractor's part and therefore fails to constitute an accidental occurrence under the policy for which coverage exists. Davenport v. USF & G, 56 Mass. App. Ct. 1109, 778 N.E.2d 1038 (2002); see also, Lerner Corp. v. Assurance Co. of America, 120 Md. App. 525, 707 A.2d 906 (1988); Harbor Court Assoc. v. Kiewit Construction Co., 6 F. Supp.2d 449, 457 (D.Md. 1988) (damage caused by faulty workmanship was "expected" and therefore not caused by an "occurrence" as defined in the CGL Policy; defects were "expected" by the contractor irrespective of whether the actual work was performed by the contractor or one of its subcontractors.); Heile v. Herrmann, 136 Ohio App.3d 351, 736 N.E.2d 566 (1999); Pursell Construction, Inc. v.

11

Hawkeye-Security, Ins. Co., 596 N.W.2d 67 (1999); Standard Fire Ins. Co. v. Chester-

O'Donley & Associates, Inc., 972 S.W.2d 1 (1998), R.N. Thompson & Associates, Inc. v.

Monroe Guaranty Ins. Co., 686 N.E.2d 160 (1997); United States Fidelity & Guaranty

Corp. v. Advance Roofing & Supply Co., Inc., 163 Ariz. 476, 788 P.2d 1227 (Az Ct App.

1989).

In Davenport v. USF & G, 56 Mass. App. Ct. 1109, 778 N.E.2d 1038 (2002), the

Court held that "faulty workmanship alone is not an 'occurrence' as defined in the

[liability] Policy nor does the cost to repair the defective work constitute property

damage."

The American Home Insuring Agreement provides:

2.   INSURING AGREEMENT

a.    The Company will pay those sums that the Assured becomes legally
      obligated to pay as damages because of ..."property damage" to which
      this insurance applies....However, the Company will have no duty to
      defend the Assured against any "suit" seeking damages for ..."property
      damage" to which this insurance does not apply....

b.    This insurance applies to ..."property damage" only if:
      (1)    The..."property damage" is caused by an "occurrence" that takes
             place in the "coverage territory"

The policy defines occurrence as:

14.   "Occurrence" means an accident, including continuous or repeated
      exposure to substantially the same general harmful conditions.

AGM alleges that the winter storm satisfies the policy's requirement of an

accidental occurrence because the storm was unexpected. This logic is flawed for two

reasons. First, it strains credulity to argue that winter storms are unexpected in New

England. Indeed, this Honorable Court may take judicial notice of the fact that winter

storms in New England are inevitable. Secondly, it is undisputed that the floating dock

12

system was designed to withstand weather far worse than encountered at the time the docks were damaged. Consequently, it cannot be disputed that faulty workmanship caused the damage. The only dispute (between AGM and Southeast Floating Docks) is which party was responsible for the faulty workmanship. For the purpose of deciding this motion, however, apportioning liability between AGM and Southeast Floating Docks is unnecessary. The faulty workmanship of either, or both, is neither unexpected nor accidental, as defined under the policy and the interpretive case law, and therefore the policy does not cover such damages.

The American Home liability policy also provides coverage for "products-completed operations hazards," as defined by Section 8, Paragraph 17, which pertains to covered hazards occurring after completion of the job. Contrary to AGM's suggestion, the products-completed operations hazards coverage does not dispense with the policy requirement that property damage be caused by an accidental and unexpected occurrence. Rather, it is coverage for property damage which 1) falls within the provisions of the Insuring Agreement (Section 1), 2) is not excluded by an exclusion (Section 2), 3) occurs away from the insured's premises, and 4) is caused by the insured's work after that work has been completed. 9 Couch on Insurance § 129:14 (3rd ed. 1996).

Unable to find coverage in the insuring agreement, AGM argues that "public policy" dictates that the insurer provide coverage for the cost and measures allegedly taken by AGM to "prevent further and more expensive losses and therefore reduce claims that must ultimately be paid by the insurers." American Home respectfully submits that this premise has no foundation in law and must be rejected.

13

The instant policy is an agreement between commercial parties and courts are not permitted to read language into the policy that does not exist. American Home notes that certain policies do contain explicit clauses whereby the underwriter agrees to reimburse the assured for expenditures which are made primarily for the underwriter's benefit either to reduce or eliminate a covered loss altogether. See Reliance Ins. Co. v. The Escapade, 280 F.2d 482 (5th Cir. 1960). However, such explicit language is notably absent from the instant policy and therefore such coverage does not exist.

Moreover, even policies which contain such explicit language require that the expenditures be made primarily for the underwriter's benefit. Even when faced with such explicit language, the underwriter's obligation to reimburse the assured comes into being only when the action taken is to minimize or prevent a loss for which the underwriter would be liable. "Where damages are not covered by the policy, expenses incurred in mitigating them for the benefit of the insurance company are not recoverable...." American Home Assurance Company v. Fore River Dock & Dredge, Inc., 321 F.Supp.2d 209 (D. Mass. 2004)(citing cases).

As discussed herein, damages to the floating dock system are not covered under the policy, and as such AGM's alleged efforts to salvage the floats to mitigate further damage are not covered. (see AGM's Correspondence of December 15, 2003 as Exhibit 12).

Based on the foregoing, American Home respectfully asserts that there is no coverage under the Policy's insuring agreement, and that therefore American Home is entitled to summary judgment without the need for further inquiry into the Policy's exclusions.

14

D.    EXCLUSIONARY CLAUSES: GENERAL PRINCIPLES OF
       CONSTRUCTION

The American Home liability policy contains various limitations on, and

exclusions from, coverage. The limitations on coverage "are set forth in the exclusion

clauses of the policy, whose function it is to restrict and shape the coverage otherwise

afforded." Lusalon Inc. v. Hartford Acc. & Indem. Co., 400 Mass. 767, 770 n. 5 (1987)

citing Weedo v. Stone-E-Brick. Inc. 81 N.J. 233, 237 (1979). A basic principle of

insurance policy construction is that "exclusion clauses subtract from coverage rather

than grant it." Donovan v. Commercial Union Ins. Co. 44 Mass.App.Ct. 596, 602 (1998)

citing Weedo v. Stone-E-Brick. Inc. 81 N.J. 233, 247 (1979). (emphasis in original).

Each exclusion is "meant to be read with the insuring agreement, independently of

every other exclusion." Continental Cas. Co. v. Gilbane Bldg. Co. 391 Mass. 143, 150

(1984), quoting Tinker, Comprehensive General Liability Insurance - Perspective and

Overview, 25 Fed'n Ins. Counsel Q. 217, 223 (1975). "The exclusions should be read

seriatim, not cumulatively. If any one exclusion applies there should be no coverage,

regardless of inferences that might be argued on the basis of exceptions or qualifications

contained in other exclusions. There is no instance in which an exclusion can properly be

regarded as inconsistent with another exclusion, since they bear no relationship with one

another." Weedo v. Stone-E-Brick. Inc. 81 N.J. 233, 249 (1979), quoting Tinker,

Comprehensive General Liability Insurance - Perspective and Overview, 25 Fed'n Ins.

Counsel Q. 217, 223 (1975).

15

In the American Home policy, the first paragraph of the Liability Coverage Form, cautions the Assured that "[v]arious provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered." The faulty workmanship of the insured, as occurred in this case, is the subject of several exclusions.

E.    EXCLUSIONS IN THE AMERICAN HOME POLICY PRECLUDE
      COVERAGE FOR AGM'S FAULTY WORKMANSHIP

"The standard form commercial general liability policy contains a variety of provisions which operate together to exclude the insured's faulty workmanship from coverage." 9 Couch on Insurance § 129:12 (3rd ed. 1996). As clearly set forth in the Policy's exclusions, set forth below, the commercial marine liability policy issued to AGM does not provide coverage for claims of defective materials or workmanship giving rise to a claim of damage to the property itself, which is the subject matter of the construction project.

1.    **The Policy Excludes Coverage for Property Damage to the Assured's
      Product Arising Out of it or Any Part of it**

The Policy specifically excludes coverage for the "Assured's Product" in this case the floating docks which were damaged. Specifically, the Policy contains the following exclusion:

2.    **EXCLUSIONS**

      This insurance does not apply to:

j.    **Damage to The Assured's Product**

      "Property damage" to "the Assured's product" arising out of it or
      any part of it.

16

The policy broadly defines "the Assured's product" as follows:

"The Assured's Product" means:

a.  Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by…[t]he Assured.

"the Assured's product" includes:

(1)  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "the Assured's product" and,

(2)  The providing of or failure to provide warnings or instructions.

In American Home's denial of coverage letter, American Home's first grounds for denying coverage was based on this policy provision excluding coverage for damages to the "Assured's Product" " arising out of it or any part of it." (American Home's denial of coverage letter, enclosed as Exhibit 8; American Home Commercial Marine Liability Policy B2291, Section 1(2) (j)). In its motion for partial summary judgment, AGM completely ignores the affect of this exclusion.

It is well settled that the "Assured's Product" exclusion is unambiguous and is designed to exclude coverage for defective damage to the construction project itself. Commerce Ins. Co. v. Betty Caplette Builders, Inc. 420 Mass 87, 647 N.E. 2d 1211 (1995); Sapp v. State Farm Fire & Cas. Co. 486 S.E.2d 71, 74 (Ga. Ct.App. 1997); Indiana Ins. Co. v. DeZutti, 408 N.E.2d 1275, 1280 (Ind. 1980). As such, it clearly applies to the floating dock system which was sold, handled and distributed by AGM.

With regard to the similar "Assured's Work" exclusion, AGM argues [inaccurately] that the exclusion does not apply because the damage to the floating docks was caused by the faulty workmanship of AGM's alleged subcontractor, who supplied

17

the floating docks. AGM has not made this argument with regard to the "Assured's

Product" exclusion, and indeed any such argument would be specious. It is well settled,

and beyond any reasonable dispute that the "Assured's Product" exclusion applies to

faulty workmanship of both the Assured and any of its subcontractors:

> We reject [the insured's] argument that the broad form property damage
> endorsement supports [its] contention in this case. The broad form
> property damage endorsement effectively rewrote [the work exclusion], so
> that [the work exclusion] relates only to property damage to work actually
> performed [by the insured], as distinguished from work performed by
> subcontractors. The argument fails because the case is governed not by
> the [work exclusion] but by the [product exclusion]. Although the broad
> form property damage endorsement modified the [work exclusion] it did
> not relate to the [products exclusion]. Commerce Insurance Company v.
> Betty Caplette Builders, Inc., 420 Mass 87, 647 N.E.2d 1211 (1995).

"The injury to... products exclusion is meant to deny coverage in situations

where the insured *or its subcontractor* has caused damage to the product ...the purpose of

the exclusion is to prevent the insured from using its products liability coverage as a form

of property insurance to cover the cost of repairing or replacing its own defective

products...." Commerce Insurance Company v. Betty Caplette Builders, Inc., 420 Mass

87, 647 N.E.2d 1211 (1995)(emphasis added). Knutson Construction Company v. St.

Paul Fire and Marine Ins. Co., 396 N.W.2d 229, 236 (Minn 1986)(even the work of

subcontractors is included in the "Your Product" exclusion); DeZuttti, 408 N.E.2d at

1280 (Even the work of subcontractors is included in the "Your Product" exclusion).

American Home vigorously disputes AGM's contention that Southeast Floating

Docks is its subcontractor. American Home contends that Southeast Floating Docks is a

vendor or materialman who supplied materials to AGM. However, even assuming

argueno that Southeast Floating Docks can be considered a subcontractor, which is

18

specifically denied, the "Assured's Product" exclusion still operates to deny coverage for

damage to the floating dock system. The liability policy was not intended to protect the

Assured from the consequences of AGM (and its subcontractors') mistakes when the only

damage is to the floating docks that AGM (and/or its alleged subcontractor)

manufactured, sold, handled and distributed.

> "The 'injury to ... products' exclusion is consistent with the goal of the
> CGL, which is to protect the insured from the claims of injury or damage
> to others, but not to insure against economic loss sustained by the insured
> due to repairing or replacing its own defective work or products...."

Commerce Ins. Co. v. Betty Caplette Builders. Inc., supra at 92 (1995), quoting 2 R.

Long, Liability Insurance § 11.09(2) (1993).

## 2. The Policy Excludes Coverage for Property Damage to the Assured's Work Arising Out of it or Any Part of it

The Policy specifically excludes coverage for the "Assured's Work" in this case

the reconstruction of MacMillian Pier and the installation of the floating dock system.

Specifically, the Policy contains the following exclusion:

### 2. **EXCLUSIONS**

This insurance does not apply to:

### k. **Damage to the Assured's Work**

"property damage" to "the Assured's work" arising out of it or any
part of it and included in the "products-completed operations
hazard".
This exclusion does not apply if the damaged work or the work out
of which the damage arises was performed on the Assured's behalf
by a subcontractor.

The policy broadly defines "the Assured's work" as follows:

"The Assured's work" means:

19

a.    Work or operations performed by the Assured or on the Assured's behalf; and

b.    Materials, pads or equipment furnished in connection with such work or operations.

"the Assured's work" includes:

a.    Warranties or representations made at any time with respect to the fitness, quality durability performance or use of the Assured's work" and,

b.    The providing of or failure to provide warnings or instructions.

The contract between AGM and the Town of Provincetown defines the scope of AGM's work as the reconstruction of MacMillian Pier including the installation of a concrete floating dock system. As noted above, the Assured's claim herein relates solely to the damage to the floating dock system itself, and not to any claim for bodily injury or property damage for which the Assured would be legally liable. As such, as a matter of law, all of the damages in this case arise out of the "Assured's Work" and are excluded from coverage under the policy. See, Frankel v. J. Watson Co., 21 Mass.App.Ct. 43 (1985); Donovan v. Commercial Union Ins. Co., 44 Mass.App.Ct. 596 (1998); Commerce Ins. Co. v. Betty Caplette Builders. Inc., 420 Mass. 87 (1995); Lusalon Inc. v. Hartford Ace. & Indem. Co., 400 Mass. 767 (1987).

Other courts which have interpreted the effect of the "injury to work" exclusion have reached the same result: the exclusion removes from coverage the insurer's obligation to pay for the repair of the insured's faulty work. In the oft-cited case of Wee do v. Stone-E-Brick. Inc., 81 N.J. 233 (1979), the Supreme Court of New Jersey held that a CGL insurer was not obligated under its policy to the assured masonry contractor for the contractor's faulty workmanship on projects where the damages claimed were the cost

20

of correcting the work itself. In that case, Stone-E-Brick applied stucco masonry to the exterior of the home of the Weedos. Once the job was completed, there were cracks in the stucco and other signs of faulty workmanship requiring the Weedos to have the stucco removed and replaced with proper material. The Weedos then pursued Stone-E-Brick to recover the repair costs.

In a companion case, Stone-E-Brick was sued by homeowners seeking recovery of the cost of replacement of defective roofing and gutters which had been installed by Stone-E-Brick. In each case, Stone-E-Brick impleaded its CGL insurer seeking defense and indemnity. In construing the CGL policy, and in particular the "work performed" exclusion, the court held that the exclusion precluded coverage under the CGL policy and that the exclusion "has been widely recognized as a valid limitation upon standard, readily-available liability insurance coverage." Id. at 245. The court succinctly stated in its conclusion, "[a]s we have endeavored to make clear, *the policy in question does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident*." Id. at 249.

In a bid to salvage coverage, AGM argues that the defective workmanship was performed by its subcontractor, and therefore the exclusion does not apply. As a matter of law, this argument is unavailing.

At the outset, American Home notes that the Town of Provincetown's allegations against AGM arise out of AGM's work at the job site and not the materials provided by Southeast Floating Docks. (Correspondence of March 10, 2004, attached as Exhibit 9). Furthermore, AGM's own contractual document, the Purchase Order, identifies Southeast Floating Docks as a mere vendor, (that is, a materialman who supplies materials for a

21

construction project) rather than as a subcontractor. Moreover, it is undisputed that Southeast Floating Docks was never present at the job site during the performance of AGM's work and instead shipped its materials from Florida to the job site in Massachusetts. As such, Southeast Floating Docks cannot be considered a subcontractor and the exclusion applies.

At the very least, Southeast Floating Docks' status is a question of fact, precluding AGM's motion for partial summary judgment. Likewise, whether the instant damages arose from Southeast floating Docks' work (providing the concrete floats in a sub-assembled condition) or from AGM's faulty installation, are questions of fact precluding AGM's motion for partial summary judgment.

Notwithstanding the foregoing, questions regarding alleged subcontractor status and the identity of the entity responsible for the faulty work will not defeat American Home's motion for summary judgment. Even assuming, *arguendo*, that Southeast Floating Docks was AGM's subcontractor and that Southeast Floating Docks' faulty workmanship (and not AGM's) caused the damage, the net effect is that this exclusion does not apply but that does not mean that coverage consequently exists. The inapplicability of the exclusion cannot be twisted into a back door argument that coverage is implied. Language stating an exception to the exclusion can never provide coverage, or create an apparent ambiguity that might be construed in favor of finding coverage. Bond Brothers v. Robinson, 393 Mass 546, 471 N.E.2d 1332 (Mass 1984). The Robinson court explained that that no insured could reasonably conclude that, "the exception to [an] exclusion...makes irrelevant another exclusion in the policy that explicitly denies coverage. Id.

22

## CONCLUSION

For the reasons set forth above, American Home respectfully requests this

Honorable Court enter summary judgment in its favor declaring that the Respondent's

claims do not fall within the coverage of the subject policy, but fall within the exceptions,

and that therefore the Petitioner American Home is not responsible to the Respondent on

such policy.

AMERICAN HOME ASSURANCE
COMPANY
By its attorneys,

Robert J. Murphy, BBO# 557659
HOLBROOK & MURPHY
150 Federal Street, 12th Floor
Boston, MA 02110
617-428-1151

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above
document was served upon the attorney of
record for each other party by mail (by hand)
on 4-13 : 05

23